UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARYL SIMON,

                    Petitioner,

    – against –

UNITED STATES OF AMERICA,

                    Respondent.

**OPINION AND ORDER**

07 Cr. 0474
08 Cr. 0260
12 Civ. 5209 (ER)

Ramos, D.J.:

On January 13, 2010, Petitioner Daryl Simon entered a plea of guilty to one count of

failing to appear for sentencing and one count of access device fraud, in violation of 18 U.S.C.

§§ 3146(a)(1) and 1029(a)(3), respectively, pursuant to a plea agreement with the Government.

On July 15, 2010, he was sentenced to 285 months in prison.  Then on July 3, 2012, Petitioner

moved to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 ("Section 2255"),

alleging principally that he received ineffective assistance of counsel in violation of the Sixth

Amendment and that the Government had breached the terms of the plea agreement.  In an

Opinion and Order dated July 2, 2014 ("July 2 Order"), this Court denied Petitioner's motion

with respect to the breach claim, but granted an evidentiary hearing to review Petitioner's

ineffective assistance claim.  Specifically, Petitioner alleged that his attorney failed to investigate

the number of victims and the amount of loss that were incorporated in the Government's

Guidelines calculation contained in the plea offer.  The Court determined that a hearing was

necessary to answer two interrelated questions: whether Petitioner's counsel sufficiently

investigated the evidence underlying the plea offer, and whether counsel's action (or inaction) in that regard resulted from purposeful strategy or deficient representation.  The evidentiary hearing to address those matters took place on January 6, 2015.  For the reasons stated below, the sole remaining claim in the petition is DENIED.

## I.      Factual Background

The facts and procedural history of this case preceding the evidentiary hearing are discussed at length in the July 2 Order, familiarity with which is presumed.

### A.   The Evidentiary Hearing

The Government called Petitioner's former counsel Richard Willstatter ("Willstatter") and a former Investigative Support Assistant for the Secret Service named Amanda Sigcha to testify.  Petitioner did not testify or call any witnesses.

#### Willstatter's Testimony

Willstatter testified that there were a number of criminal matters pending against Petitioner when he first agreed to represent him in 2009.  Petitioner had already plead guilty pursuant to a Pimentel letter to credit card fraud in 2007, and then failed to appear for sentencing.  When Petitioner was re-arrested in 2008, he was charged with one count of failing to appear in violation of 18 U.S.C. § 3146(a)(1).  In addition, when Petitioner was arrested in 2008, the arresting officers found evidence that he was engaging in yet another credit card scheme. (Tr. at 11:8-12:13.)  Although the Government had not filed a complaint for the second credit card scheme, Willstatter considered it "inevitable."  (Tr. at 11:8.)

With three criminal matters pending against Petitioner, the Government had, in its own words, "a lot of leverage" in negotiating with Willstatter.  (Tr. at 87:23-25.)  Willstatter himself

testified that if he could not reach an agreement with the Government, his client faced the prospect of three different trials and three separate sentencings.  (Tr. at 49:11-18.)  Willstatter's testimony went on to explain his view of Petitioner's three matters.  For the first credit card scheme, Willstatter and Petitioner agreed that "[t]here was no factual basis" to withdraw the prior guilty plea.[1]  (Tr. at 21:10-14.)  For the bail jumping charge, Willstatter saw no viable defense and testified that Petitioner agreed with his assessment.  (Tr. at 13:13-14.)  And for the second credit card scheme, Willstatter maintained that "at no time" did Petitioner express to him an interest in taking that matter to trial.  (Tr. at 12:23-24.)  Rather, over the course of "[a]t least half a dozen" meetings, they discussed ways to "find a settlement with the government that would reduce his criminal exposure."  (Tr. at 14:12-15:1.)

In the course of negotiating a plea agreement, Willstatter attempted to seek information from the Government about the second credit card scheme.  (Tr. at 41:12-13.)  However, he encountered "intense resistance from the United States government with respect to getting discovery."  (Tr. at 52:13-15.)  He testified that he could not insist on discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure because Petitioner had not yet been formally charged with the second credit card scheme.  (Tr. at 24:16-20.)  Furthermore, the Government rejected his suggestions that he examine the evidence inside a secure facility with a computer systems analyst, or under a protective order.  (Tr. at 25:19-24; 30:15-22.)

---

[1] According to Willstatter's testimony, he reached that conclusion in light of prior admissions Petitioner had made. First, Willstatter testified that "there were admissions alleged to have been made at the time that [Petitioner] was arrested" in connection with the first credit card scheme.  (Tr. at 21:22-24.)  Then, while represented by a previous attorney, Petitioner had "made some admissions of guilt" to the Government in a failed attempt at cooperation.  (Tr. at 21:22.)  Petitioner had also allocuted to his criminal conduct during the guilty plea in court.  Willstatter testified that pursuing a withdrawal of the plea under those circumstances "would not [have been] fruitful" and could instead have backfired on Petitioner – and that Petitioner agreed.  (Tr. at 22:3-7.)

Instead, Willstatter seized on the Government's stated intent to seek restitution as a "hook" to gain access to the Government's evidence. (Tr. at 31:1-8.) Specifically, he explained that under the Second Circuit's interpretation of the Mandatory Victims Restitutions Act, 18 U.S.C. § 3663A, restitution is available only after victims and their individual losses have been identified. In a letter to the Government on November 12, 2009, Willstatter argued that the law gave him "a right to review the government's basis for restitution."[2] (Tr. at 30:7-8; 31:4-5.) The Government then agreed to "reveal to [Willstatter] the basis for its restitution numbers and how they got there." (Tr. at 35:20-22.)

On December 18, 2009, Willstatter met with the Government and was provided information relating to the number of credit cards and losses associated with the second credit card scheme. (Tr. at 25:8-25:13; 35:5-12.) The Government did not permit him to inspect the information personally; he was allowed to take notes, however, as an agent read from a spreadsheet describing "the government's claims of intended loss and its claims for actual loss." (Tr. at 35:25-36:5.) Willstatter's notes recorded that the Government had identified 144 credit cards with a loss greater than $500, 122 credit cards with a loss less than $500, and 1,039 credit cards with no loss. The Government calculated the total loss at $823,664.66. (Tr. at 36:12-21.)

Willstatter testified that he believed the Government's figures "were unlikely to be successfully challenged," and that further investigation posed "significant litigation risk[s]" to Petitioner. (Tr. at 37:7-17.) Petitioner himself could not verify the precise number of access devices he possessed, or the number of victims he defrauded. (Tr. at 43:12-20; 59:16-21.) Indeed, Willstatter testified that it was possible that by "pressing" the Government on the loss

---

[2] Willstatter cited to United States v. Zakhary, 357 F.3d 186, 190 (2d Cir. 2004) ("A lump sum restitution order entered without any identification of victims and their actual losses is not permissible."), which in turn relies on United States v. Catoggio, 326 F.3d 323, 328 (2d Cir. 2003).

figures, Petitioner's potential exposure could increase.  (Tr. at 37:20-22.)  For example, because the Government had discovered at least 266 credit cards with ascertainable losses, it was possible that they would ultimately be able to identify more than 250 individual victims, which would have increased Petitioner's Guidelines level.[3]  (Tr. at 37:12-17.)  Besides an increase in the number of victims, more fraudulent credit cards might also have been uncovered with additional investigation.  (Tr. at 37:20-21.)

Willstatter reiterated that Petitioner's three pending criminal matters placed him "in a very vulnerable position."  (Tr. at 59:25-60:1.)  The Government had threatened to prosecute the three matters consecutively, (Tr. at 49:19-23), and "force three different sentencings."  (Tr. at 31:18-21.)  Consequently, Willstatter "advised [Petitioner] that [he] didn't think that there was much of a point in trying to litigate" the Government's figures.  (Tr. at 42:1-3.)  He testified that Petitioner agreed.  (*Id.*)  Willstatter stated that after he "had gone over the numbers the government had presented" with Petitioner, including "how they got those numbers," (Tr. at 43:15-21), Petitioner did not object to the number of fraudulent access devices, or to the range of loss, calculated by the Government.   (Tr. at 41:18-42:8.)   At the conclusion of the plea bargaining process, Willstatter testified that he had "no doubt" that Petitioner "understood the plea agreement that he ultimately accepted."  (Tr. at 43:22-25.)

### Sigcha's Testimony

The Government's other witness at the hearing was Amanda Sigcha, a former Investigative Support Assistant for the Secret Service, who played a limited role in the

---

[3] The relevant provision in the Sentencing Guidelines, U.S.S.G. § 2B1.1(b)(2)(C), has since been revised and no longer includes the same thresholds for raising a defendant's offense level.  However, at the time of Petitioner's sentencing, he would have faced an additional two levels under the Guidelines if the offense involved more than 250 victims.

investigation into Petitioner's credit card fraud.  Sigcha received Petitioner's fraudulent credit cards from a case agent, and then "created a spreadsheet in which [she] listed all of the credit card numbers and the fraud loss, if they were determined."  (Tr. at 66:1-3.)  The Government represented to the Court that the spreadsheet created by Sigcha was the one read to Willstatter at the December 18 meeting.  (Tr. at 61:13-16.)  Sigcha herself did not attend that meeting, however, and the Government acknowledged that she had no "personal knowledge as to where the credit card information that she put on the spreadsheet came from."  (Tr. at 62:10-12; 60:23-25.)

### B.  Post-Hearing Briefing

Petitioner had previously appeared *pro se* but retained an attorney for the hearing.  At the conclusion of the hearing, this Court granted Petitioner and the Government permission to submit post-hearing memoranda.  Both parties filed briefs with the Court in March 2015.

## II.   LEGAL STANDARD

To establish ineffective assistance of counsel, a petitioner must demonstrate (1) that his counsel's performance "fell below an objective standard of reasonableness," measured in accordance with "prevailing professional norms," such that the attorney was "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that counsel's "deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).[4]

---

[4] The four-factor test that Petitioner urges this Court to apply in "conducting its [*Strickland*] review," (Doc. 28 at 8), arises only when an appellate court reviews "whether a district court abused its discretion in denying a motion to substitute counsel."  *United States v. John Doe No. 1*, 272 F.3d 116, 122 (2d Cir. 2001).  That issue is not present in the instant petition.

When assessing counsel's performance under the first *Strickland* prong, courts must endeavor to "eliminate the distorting effects of hindsight" and to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Moreover, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

The prejudice prong of *Strickland* requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The petitioner bears the burden of proof in a § 2255 proceeding, and must prove his or her constitutional claim by a preponderance of the evidence. *Harned v. Henderson*, 588 F.2d 12, 22 (2d Cir.1978); *see also Feliz v. United States*, 01 Civ. 5544 (JFK), 00 Cr. 53 (JFK), 2002 WL 1964347, at *4 (S.D.N.Y. Aug. 22, 2002).

## III.   DISCUSSION

### A.  Performance Prong

Petitioner argues, principally, that Willstatter's failure to secure discovery materials from the Government amounted to deficient representation because it led Petitioner to accept a plea agreement based on an unverified number of credit cards, losses and victims. (Doc. 28 at 9-10; Tr. at 96:13-97:2.) He contends that instead of pursuing discovery in an attempt to bargain down Petitioner's sentence, Willstatter "conceded to the Government's calculations" without any "investigation or contest." (Doc. 28 at 10.)

But Willstatter's testimony at the evidentiary hearing – which the Court credits in its entirety – contradicts Petitioner's assertions, establishing that he successfully investigated the basis for the Government's calculations.   Further, Willstatter exhibited reasonable judgment when he decided to embark on a strategy – which he cleared with Petitioner – not to challenge the Government's evidence out of concern that continued investigation would only worsen Petitioner's position by uncovering additional victims and losses.   His performance therefore easily clears the standard set by *Strickland*.

When asked at the hearing if he pursued any alternate means of accessing the Government's evidence, Willstatter recounted successive, if unsuccessful, attempts at acquiring the material:   he tried to get the discovery with a protective order, he offered to inspect the evidence inside a secure facility with the aid of a computer forensic expert, and he asked to visually examine the Government's raw data.   (Tr. at 52:3-6; 53:2-11.)   The Government declined each of these requests.

Although Petitioner concedes that Willstatter "was undoubtedly impacted by the Government's position to not release any discovery," he still faults him for not going further to obtain the evidence.  (Doc. 28 at 9-10.)  Thus, Petitioner's allegation that Willstatter "failed to *pursue* discovery," (Doc. 28 at 10) (emphasis added), seems to rest entirely on his failure to *obtain* discovery.  But Petitioner ignores three important points.

First, Petitioner was not entitled to Rule 16 discovery for the second credit card scheme because the Government had not yet indicted him.  (Tr. at 50:3-9); *see Daniels v. City of New York*, 200 F.R.D. 205, 209 n.7 (S.D.N.Y. 2001) ("Pre-action discovery is generally not

permitted."); *Frigerio v. United States*, 10 Civ. 9086 (SAS), 2011 WL 3477135, at *1 (S.D.N.Y. Aug. 5, 2011) ("The American legal system does not permit pre-action discovery.").[5]

Second, Willstatter was ultimately provided with the Government's underlying figures for the second credit card scheme as a result of his successful invocation of Petitioner's right to review the Government's basis for restitution.   (Tr. at 31:4-5, 7-8.)   By insisting on the December 18 meeting with the Government, Willstatter was able to ensure that there was an adequate factual basis for the Government's loss and victim figures.  (Tr. at 89:4-5.)

Third, Willstatter's testimony indicates that his choice not to further challenge the Government's figures represented a tactical decision he believed to be in Petitioner's best interest, which he discussed with Petitioner.   While Willstatter was not able to conduct a "complete investigation" into the numbers, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91.

At the evidentiary hearing, Willstatter described in detail the strategic reasons he had for limiting the inquiry into Petitioner's credit card offenses.   For one, Willstatter feared that the Government "could develop more victims" or "develop a basis for a higher loss amount with respect to either the 2007 or 2008 offenses." (Tr. at 26:18-21.)  Willstatter based his thinking on

---

[5]  Although Petitioner cites to several cases in his post-hearing brief for the proposition that failing to obtain discovery can render counsel's performance ineffective, he concedes that "the case law is not 'on point.'"   (Doc. 28 at 9.)  His concession establishes why the case law is unavailing.  As explained above, Willstatter had no statutory or common-law right to demand discovery from the Government, nor did the Government have any obligation to turn over evidence to the Petitioner.   *Compare with Flores v. Demskie*, 215 F.3d 293 (2d Cir. 2000) (ineffective assistance of counsel claim hinged on the defendant's statutory right to inspect witness statements prior to trial); *United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) (finding that the Government had a duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose favorable evidence to defendants in criminal prosecutions).   Thus, Willstatter in no way misunderstood the prevailing law, or waived his client's right to discovery materials.

the fact that the Government had identified over 250 defrauded credit cards with "actual loss," but stipulated to a victim count of just "more than 50." (Tr. at 36:12-37:22.)

Petitioner also gave Willstatter little reason to think that they could successfully challenge the Government's figures, since he could not recall the number of credit cards he had defrauded. Petitioner agreed with Willstatter that they "really shouldn't be litigating" the Government's loss amount, and could point to no basis for contesting the Government's credit card and victim numbers.[6] (Tr. at 42:10-11; 43:17-21.) Even if they had chosen to contest the Government's figures, Willstatter took into account the Government's threat to "segregate" Petitioner's criminal matters and bring "three consecutive cases" against him if he did not accede to a "sentencing agreement or plea agreement." (Tr. at 49:19-23.) Moreover, Willstatter expressed concern that the particular judge assigned to Petitioner's case "might mete out a very high sentence if [Petitioner] wanted to put the government to its proof."[7] (Tr. at 14:3-7.)

The evidence thus answers the two questions left open before this Court: (1) Willstatter did indeed make efforts to investigate the Government's evidence, and (2) his decision to not further challenge the Government's figures resulted from reasoned deliberation and discussion

---

[6] Petitioner's counsel acknowledged at the hearing that Willstatter "clearly discussed" with Petitioner the Government's numbers from the December 18 meeting. However, he insisted that Willstatter's advice was defective because it stemmed from the Government's "spoken word[s]" rather than Willstatter's own "investigatory technique." (Tr. at 95:10-19.) If Petitioner in hindsight questions Willstatter's decision to forego further investigation, that alone does not mean that Willstatter provided ineffective assistance at the time. *See United States v. Simmons*, 923 F.2d 934, 956 (2d Cir. 1991) (noting that client's dissatisfaction with attorney's strategy "alone is insufficient to establish [an] attorney's ineffectiveness.").

[7] Petitioner nevertheless suggests two methods by which Willstatter could have attempted to wrest discovery from the Government: a motion seeking to compel discovery in the interest of justice and a protective order. (Doc. 28 at 9.) However, Petitioner cites to no particular statute, case, or rule of criminal procedure that would have authorized a motion to compel pre-complaint discovery in this instance. (*Id.*) Moreover, Willstatter operated against a legal backdrop that generally disfavors pre-action discovery. *See, e.g.*, *Daniels*, 200 F.R.D. at 209 n.7 ("Pre-action discovery is generally not permitted.); *Frigerio*, 2011 WL 3477135, at *1 ("The American legal system does not permit pre-action discovery."). As for the protective order, Willstatter testified that he explored that option but faced resistance from the Government. (Tr. at 52:2-4.) Overall, Willstatter's choice to not pursue these two specific motions aligns with his strategy, described above, to not press the Government for further discovery.

with his client, not from "oversight, carelessness, ineptitude or laziness." *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009). Willstatter testified that he and Petitioner openly discussed the drawbacks of continued litigation, and that Petitioner agreed with Willstatter's advice to not challenge the Government's figures. These professional judgments were reasonable under the circumstances. *Strickland*'s performance prong "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," 468 U.S. at 689, and neither Willstatter's testimony nor Petitioner's general allegations upset that presumption. Therefore, Willstatter's reasonable, strategic judgment cannot support a claim for ineffective assistance of counsel. *See United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987).

### B. Prejudice Prong

Because Petitioner has failed to establish that Willstatter's performance amounted to deficient representation, this Court need not reach *Strickland*'s second prong. Petitioner cannot be said to have suffered prejudice at the hands of able representation. Indeed, *Strickland* advises that "there is no reason for a court deciding an ineffective assistance claim . . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 668; *see also Morales v. United States*, 635 F.3d 39, 45 (2d Cir. 2011) (having failed the prejudice prong, "it [was] unnecessary to determine whether [counsel's] performance was deficient."); *Arias-Javier v. United States*, 11 Civ. 5550 (LAP), 07 Cr. 1186 (LAP), 2015 WL 4622477, at *6 (S.D.N.Y. Aug. 3, 2015) ("[B]ecause Petitioner has failed to meet the first prong of the *Strickland* test, his ineffective assistance of counsel claim fails.").

## IV. CONCLUSION

For the reasons set forth above, Petitioner's motion is DENIED.   The Clerk of Court is respectfully directed to close the case.

It is SO ORDERED.

Dated:   November 18, 2015
         New York, New York

_____
Edgardo Ramos, U.S.D.J.